UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

---

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | NO. CR17-190 RSL |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | December 15, 2017 |
| ) | Seattle, Washington |
| RIBEIRO TRELHA GUSTAVO, ) | 9:00 a.m. |
| ) | |
| Defendant. ) | |

---

**TRANSCRIPT OF FELONY SENTENCING PROCEEDINGS
BEFORE THE HONORABLE ROBERT S. LASNIK
UNITED STATES DISTRICT COURT JUDGE**

---

For the Plaintiff:        MR. BENJAMIN T. DIGGS
                          Assistant United States Attorney
                          700 Stewart Street, Suite 5220
                          Seattle, Washington 98101

For the Defendant:        MR. DENNIS CARROLL
                          Federal Public Defender
                          1601-5th Avenue, Ste 700
                          Seattle, Washington 98101

U.S. Probation Office:    MS. SARA MOORE
                          U.S. Probation Officer

Portuguese Interpreter:   Jonas Nicotra

Court Reporter:           Leslie A. Waltzer, CSR
                          3641 North Pearl Street
                          Tacoma, WA 98407

(Proceedings recorded by mechanical stenography; transcript produced with aid of computer.)

1    (Defendant Present, in Custody)
2            THE CLERK: All rise. The United States
3    District Court for the Western District of Washington is
4    now in session, the honorable Robert S. Lasnik presiding.
5            THE COURT: Good morning. Thank you. Please be
6    seated.
7            THE CLERK: Case CR17-190 RSL, *United States*
8    *versus Ribeiro Trelha Gustavo*. Counsel, would you please
9    make your appearances.
10           MR. DIGGS: Good morning, Your Honor. Benjamin
11   Diggs for the United States.
12           THE COURT: Hi, Mr. Diggs.
13           MR. CARROLL: Good morning, Your Honor. Dennis
14   Carroll on behalf of Gustavo Trelha.
15           THE COURT: And thank you very much,
16   Mr. Carroll.
17       We have a Portuguese interpreter here. Thank you
18   very much. Sara Moore from U.S. Probation is sitting in
19   for Andrea Porter, and our interpreter is Jonas Nicotra.
20           THE INTERPRETER: Yes, Your Honor.
21           THE COURT: And let's get the names straight,
22   first off. Mr. Diggs can we -- what are we going to do?
23   Add -- change the name on the caption or add it as an AKA
24   or --
25           MR. DIGGS: Adding it as an AKA probably makes

1   sense, since I have this preprinted caption, but I
2   understand that our -- our understanding of his true name
3   was inaccurate at the time of his charging, so I'm happy
4   to make that adjustment.
5           THE COURT:  Okay.  And, Mr. Carroll, you have --
6   the correct sequence of these names is?
7           MR. CARROLL:  Gustavo Ribeiro Trelha.
8           THE COURT:  Okay.  Great.  So we'll add that as
9   an AKA, with an acknowledgement that that is his true
10  name.  Gustavo is the first name, not the last name;
11  Ribeiro is the middle name, not the first name; and
12  Trelha is the last name, not the middle name.  We got all
13  three wrong, which is a Trifecta, right, Ms. Moore?
14          MS. MOORE:  Yes.
15          THE COURT:  Okay.  So I have reviewed in
16  preparation for the sentencing today the revised
17  Pre-Sentence Report from Ms. Porter, I have Mr. Diggs'
18  Sentencing Memorandum on behalf of the United States, and
19  I have Mr. Carroll's Sentencing Memorandum on behalf of
20  Mr. Trelha, which included a number of exhibits, a letter
21  accepting responsibility, a letter from family members,
22  some pictures, and the like.
23      So, Mr. Carroll, do I have everything you wanted me
24  to have in preparation for the sentencing?
25          MR. CARROLL:  Yes, Your Honor.

1       THE COURT: And have you had an opportunity to
2  go over the government's reports with your client and
3  make any additions or corrections?
4       MR. CARROLL: I have, Your Honor.
5       THE COURT: Mr. Trelha, are you ready to proceed
6  to sentencing today?
7       THE DEFENDANT: Yes.
8       THE COURT: Okay. Thank you.
9    Mr. Diggs, we'll start with you.
10      MR. DIGGS: Thank you, Your Honor.
11   The government is recommending 12 months and one day
12  imprisonment, followed by three years of supervision.
13  That is a recommendation at the low end of the Advisory
14  Sentencing Guidelines, and one that's joined by the
15  United States Probation Office in recognition that this
16  is a serious, sophisticated and harmful offense.
17     In terms of the seriousness, in addition to the 62
18  account numbers that were found in the Defendant's
19  possession, we know that almost 300 more were compromised
20  in just the three days that his behavior was observed by
21  bank investigators. And we know, in addition, that he
22  was in the Seattle area for roughly a week before that
23  observation by the bank even started, so we don't really
24  know, frankly, the full extent and the full harm that was
25  caused by this offense.

1    Based on this pattern, he was skimming roughly 100
2 accounts per day from this single ATM.  In his hotel room
3 an additional skimmer and three more cameras were found,
4 so he may have been running more than one machine at a
5 time, and there were multiple hard drives and computers.
6 So, as I noted in the government's Memorandum, we think
7 this is likely -- the 62 accounts that he's charged with
8 here is likely the tip of an iceberg of fraud, and so we
9 think that the low end of this Advisory Guidelines, in
10 fact, may understate, frankly, the degree that this fraud
11 went on.
12    In terms of sophistication, we know -- as I said,
13 there were additional devices found in his room.  These
14 are devices that are fashioned pretty ingeniously,
15 actually, to mimic and cover the actual ATM devices and
16 apparatus to conceal their appearance, and the
17 unsuspected ATM user obviously has no idea what's going
18 on.  There were dozens of blank cards found in the hotel
19 room, a credit card reader/writer.  He had some ten
20 fraudulent cards on his person in an AKA at the time of
21 the offense.  He appears to have traveled from Florida to
22 Washington to commit this offense, and by his admission,
23 he was sending these account numbers, once they were
24 stolen, to associates overseas.
25    In the Defendant's Memorandum he has kind of styled

1  himself as a bit player here and someone who was just
2  kind of a functionary of putting these machines on the
3  ATMs and then getting the numbers back out.  But the kind
4  of whole picture of everything found on his person and in
5  his hotel room kind of bespeaks of a more sophisticated
6  and frankly more involved operation.
7       And then in terms of the harm, you know, the -- as I
8  noted in my Memorandum, more than the time and
9  inconvenience of having your account number stolen,
10 offenses like this really tear at a customer's feeling of
11 security in their -- in their personal information, and
12 that's the loss here that kind of makes identity theft a
13 particularly devastating offense.  As I noted, we largely
14 don't know who all the victims here are, but there's no
15 doubt that there were people harmed.  Dozens of card
16 numbers were involved -- again, roughly 100 accounts per
17 day compromised that we know about -- so there are
18 victims out there, even if we don't kind of know the full
19 extent.  And in recognition of that harm and the
20 seriousness of these kinds of offenses, it should be
21 noted that this is an offense that could be charged as
22 aggravated identity theft in recognition of Congress'
23 feeling that this conduct warrants sanction.
24           THE COURT:  And it also could have been kept in
25 state court and prosecuted under a first-time offender

1 waiver or something like that, so there's something in
2 the middle that has been followed here.
3     Where was the actual -- what bank are we talking
4 about?  Which Chase branch?
5         MR. DIGGS:  It was a stand-alone -- my
6 understanding is it was a stand-alone ATM at Pike Place
7 Market, basically.
8         THE COURT:  Okay.  Got it.  You more and more
9 see security guards now who stand out there just to stop
10 somebody from fiddling with the machines, and, you know,
11 it does have a tremendous impact on how we live our lives
12 when you can't trust an ATM to not have one of the
13 devices on there, or when you put your PIN in, you have
14 to cover up and the like.  It's very annoying.
15         MR. DIGGS:  Moving on to the nature and
16 circumstances of Mr. Trelha's life, you know, his
17 Memorandum describes largely positive personal
18 circumstances in terms of his education, his employment,
19 and his family connections.  But those same positive
20 aspects kind of leaves one scratching their head in terms
21 of why he would have committed this crime in a country
22 far from home and risk the significant fallout that he's
23 experiencing now.  You know, he had no need to do this
24 and, really, greed is the only explanation one can arrive
25 at.

1    He had, as described in the Presentence Report, some
2 positive income from his construction business with his
3 girlfriend, he had savings in his name in Brazil, and
4 that kind of financial security calls into question why
5 he would take this risk for what he describes as pretty
6 limited money.  Now, that claim is -- is just his.  We
7 don't know if that $100 a day payment is verified, but it
8 doesn't make a lot of sense.
9         THE COURT:  It doesn't make any sense.
10        MR. DIGGS:  And the same is true for his family
11 connections.  His letters of support show a strong family
12 support system, but it's not as though he was ripped from
13 the bosom of his family to commit this offense.  He came
14 here in 2014.  He overstayed his visa, and he stayed, and
15 he stayed here to commit this fraud while, you know, his
16 loved ones were back in Brazil.  It's difficult for him,
17 I realize, but he -- those are considerations, obviously,
18 that should have been on his mind at the time he was
19 committing this conduct.  So the government's
20 recommendation is 12 months and one day.
21    Unless Your Honor has any questions, that will end my
22 remarks.
23        THE COURT:  Thanks, Mr. Diggs.
24    Mr. Carroll?
25        MR. CARROLL:  Thank you, Your Honor.

1     Our recommendation is for credit for time served,
2  which is about seven-and-a-half months.  Frankly, we're
3  not very far apart, us and the government if -- once good
4  time is considered.  If he gets good time, that's about
5  two months off, and that would be a ten-month sentence.
6  He would probably be immediately eligible for BOP
7  prerelease if he were a citizen, so he would be eligible
8  for immediate release if not for the citizenship issue.
9  So I would suggest the citizenship issue is one of many
10 reasons for a slight variance from the Guidelines.
11     Going to his family situation, he has a great family,
12 a very supportive family.  He's very close to his family.
13 Several things struck me as I was reviewing the letters.
14 First is that the tragic situation with his sister Anna,
15 who has passed away since he's been incarcerated.  We
16 were fortunate to be able to get a letter from her
17 beforehand, and he feels just terrible about not
18 being able to be with his family, to grieve for her loss,
19 and to help support his family.
20     His father, the Reverend Demorvan Trelha, is still
21 hospitalized.  He has some blood pressure issues.  My
22 client reports he's still in the hospital.  He had a
23 clot, so he had some complications from that.  Reading
24 the letter from his father kind of struck me, because his
25 description of his son was sort of similar to a

1  description -- or my experience with my client.  When he
2  was first brought over to federal custody, every meeting
3  was kind of weepy.  He was very anxious but also very sad
4  about being separated from his family, the impact this is
5  having on his family, and he was also kind of -- pretty
6  scared about being in custody.  He's had some issues in
7  custody where he reported an attempted sexual assault,
8  and then he sort suffered the repercussions from that as
9  well.
10      He's had a good life, and that makes -- there's
11 really no explanation for this except it was really just
12 a dumb thing to do on his part.  And I know that the
13 government sort of points to that to make that an
14 aggravating factor, and, you know, I would suggest the
15 fact that he hasn't had a horrible life like a lot of
16 people that appear before this Court -- normally we're
17 arguing that that's a mitigating factor.  But I think the
18 absence of a horrible life doesn't make it an aggravating
19 factor, and I think that his family support and his
20 family situation supports our assertion that he's a
21 pretty low-risk offender.  He's going to get deported.
22 He's not going to be able to come back.  He looks forward
23 to moving back to Brazil and being with his family.  He's
24 had no prior contact with law enforcement, no prior
25 arrests or anything like that, so I think the Court can

1  be pretty assured that he's not going to re-offend.
2       The government sort of points to the global effect of
3  aggravated -- or identity theft on society and on the
4  community.  I guess my only point is that this isn't your
5  more serious aggravated identity theft type case where
6  Social Security numbers and dates of birth are stolen and
7  people are creating entirely new accounts in someone's
8  name, so the clean-up is a little bit easier in these
9  sorts of situations.
10      The government argues, well, there's probably a lot
11 more victims.  Well, they could more or less say that in
12 almost any type of fraud case and drug case.  You know,
13 there's a lot more out there.  This is all we know about.
14 I would first say that's speculation but, yes, let's
15 assume that there is.  I would still suggest that it's
16 pretty clear that he was shipping the information out.
17 He was, I would say, a lower-level, non-equity partner in
18 all of this.
19      So in the end, Your Honor, this Court's just required
20 to impose the minimum term necessary, and I think there
21 are several reasons to go very slightly below the
22 Guidelines that would more or less warrant a time-served
23 sentence.  He would get timed served, more or less, if he
24 were a citizen, and we're simply asking that the Court
25 impose such a sentence.  He's look forward to getting

1   back to his family and being with them during this time.
2          THE COURT:  Okay.  Thanks, Mr. Carroll.
3      Mr. Trelha, would you like to say anything to me?
4   I've read your letter, but this is your opportunity to
5   tell me anything you want me to know.
6          THE DEFENDANT:  I would like to say that I'm
7   very sorry for my mistake, and if I could go back to my
8   family.  I'm very sorry.
9          THE COURT:  All right.  Thank you.
10     This is correctly scored by U.S. Probation as an
11  offense level 13, a criminal history category of one,
12  with a Guideline range of 12 to 18 months.  The
13  government's recommendation and Probation's is a year and
14  a day, and that's certainly a reasonable recommendation.
15  But I do believe that this was not just a first-time
16  offense but an only-time offense for Mr. Trelha, and I'm
17  going to give him credit for time served, and I'm not
18  going to impose any period of supervised release, because
19  he will be deported.
20     And, Mr. Trelha, this is very important.  Once you
21  are deported, you must not come back into the United
22  States without specific permission of the Secretary of
23  the Department of Homeland Security, which you're not
24  likely to get.  If you are granted such permission to
25  reenter, you must contact the nearest U.S. Probation

1   Office within 72 hours of your return to the United
2   States.
3       But, you know, this is part of the punishment here,
4   is that you cannot come back to the United States, and
5   that's something you always wanted to do, apparently.
6   You had establish a business, and you were trying to do
7   things here, and you're going to have to return to Brazil
8   and live your life there.
9       But I think the amount of time you've served has made
10  an impact.  The recognition that what you did was not
11  just illegally wrong but was morally wrong, and that you
12  carry a certain amount of shame within you and the shame
13  that your parents feel for what -- they thought they
14  raised you better than that, and the impact it's had on
15  them, the impact it's had on you missing the ability to
16  be with your sister during her difficult time, those are
17  all very strong elements of punishment that I think will
18  convince you to never do this again.
19      So I'm going to impose that credit for time served
20  and waive the fine, but there's a $100 Special Assessment
21  which is due immediately.
22      And, Mr. Diggs, if you'll show that to Mr. Carroll.
23          MR. DIGGS:  Yes, Your Honor.
24          MR. CARROLL:  I've reviewed the Judgment.
25          THE COURT:  Thanks.  You can approach,

1   Mr. Diggs.
2       I didn't even mention being away from your son, which
3   I know was extremely painful for you too.
4       I've signed the Judgment in the case.  And,
5   Mr. Carroll, there was a waiver of appeal in the Plea
6   Agreement, correct?
7           MR. CARROLL:  That's correct, Your Honor.
8           THE COURT:  So, of course, you're not going to
9   be released today from custody because of your
10  immigration hold, but hopefully you'll be on your way
11  back to your family relatively quickly.  Good luck to
12  you.
13      Thanks very much, Mr. Diggs, Mr. Carroll.  We'll be
14  adjourned.
15          (End of Proceedings.)
16
17
18
19
20
21
22
23
24
25

C E R T I F I C A T E

STATE OF WASHINGTON)
                   ) ss.
County of King     )

I, the undersigned Notary Public in and for the State of Washington, do hereby certify:

That the foregoing verbatim transcript of proceedings was transcribed under my direction; that the transcript is a full, true and complete transcript of the testimony of said witness, including all questions, answers, objections, motions and exceptions;

That I am not a relative, employee, attorney or counsel of any party to this action or relative or employee of any such attorney or counsel, and that I am not financially interested in the said action or the outcome thereof;

That I am herewith securely sealing and digitally signing this transcript and delivering the same via electronic filing to the Clerk of the Court.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this 12th day of January, 2018.


                    /S/ Leslie Waltzer
                    Notary Public in and for the State
                    of Washington, residing at Issaquah